BRIDGET QUINLAN,          )
                       )
          Plaintiff,      )     No. 11 C 5956
                       )
     v.                 )
                       )     Judge Edmond E. Chang
ELYSIAN HOTEL COMPANY LLC,  )
                       )
          Defendant.   )

## MEMORANDUM OPINION AND ORDER

Plaintiff Bridget Quinlan alleges that her former employer, Defendant Elysian Hotel, fired her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k).[1] Quinlan also claims that Elysian Hotel interfered with her rights under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, and created a hostile work environment. Elysian moves for summary judgment on all counts. R. 24. For the following reasons, Elysian's motion is granted in part and denied in part: the Title VII claim survives, but the FMLA and harassment claims do not.

## I. Factual Background

In deciding this summary judgment motion, the Court views the evidence in the light most favorable to the non-movant, Quinlan. In May 2008, Elysian Hotel[2] hired

---

[1]The Court has subject matter jurisdiction in this federal-question case under 28 U.S.C. § 1331.

[2]After Quinlan filed this lawsuit, Elysian was purchased and rebranded as a Waldorf-Astoria hotel. R. 26, Def.'s Stmt. of Facts (DSOF) ¶ 1. In this opinion, references to Elysian refer to Defendant Elysian Hotel as it existed before becoming a Waldorf-Astoria hotel.

Quinlan to be its public relations director. R. 26, Def.'s Stmt. of Facts (DSOF) ¶ 2. At the time, Elysian was an entirely new construction project, and a completely unknown hotel brand. DSOF ¶ 5. As the public relations director, Quinlan was expected to generate positive press, manage Elysian's image, manage photo shoots, entertain media, and coordinate the hotel's charitable outreach. DSOF ¶ 6. Early on, Elysian's director of marketing, Gianna Tetrick, was Quinlan's supervisor. DSOF ¶ 19.

Elysian was expected to open in the spring 2009, but the opening was delayed several times. DSOF ¶ 14. In December 2009, Elysian fired Tetrick, and Joseph Aguilera, vice president of marketing and sales, took over as Quinlan's supervisor. DSOF ¶¶ 9, 19. Mary Beth Malone, one of Elysian's investors who had overseen construction of the hotel, also took on marketing duties at that time and eventually became the marketing director. DSOF ¶¶ 8, 21. Later that month, Elysian opened its doors. DSOF ¶ 19.

In February 2010, Quinlan informed her supervisors, Aguilera and Malone, that she was pregnant. DSOF ¶ 26. In the following months, Elysian's occupancy rates began to increase. DSOF ¶ 30. By April, the hotel was extremely busy, and the workloads of Elysian employees increased as well. DSOF ¶¶ 30, 34-35. Quinlan had been juggling her public relations responsibilities along with the marketing work that came her way. DSOF ¶ 35. But Quinlan gradually began to handle more of the marketing responsibilities, and her hours increased to between 50 and 60 hours per week. DSOF ¶ 35-36. In fact, Quinlan was the only employee performing tasks related to marketing work under Aguilera and Malone's supervision. DSOF ¶ 40.

By May 2010, it was clear that Elysian was losing more money in 2010 than originally forecasted, and the hotel began to cut costs. DSOF ¶¶ 44, 46-47. In January 2011, Kevin Robinson (Elysian's general manager) asked the hotel planning committee to identify salaried positions that Elysian could eliminate without affecting the hotel's performance. DSOF ¶¶ 9, 66-67. Aguilera suggested that Elysian could operate without an on-site director of public relations, and the planning committee agreed. DSOF ¶¶ 68, 71-73. Ultimately, Robinson and the hotel's development partners approved of the committee's assessment, and Quinlan was fired in February 2011. DSOF ¶¶ 74-75.

## II. Standard of Review

Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008).

## III. Title VII

Quinlan argues that she was fired because of her sex and pregnancy. *See generally* R. 37 (Pl.'s Br.). Title VII prohibits employment discrimination on the basis of sex. 42 U.S.C. § 2000e-2(a). In 1978, Congress amended Title VII by enacting the

Pregnancy Discrimination Act, which explicitly barred discrimination on the basis of pregnancy:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . .

42 U.S.C. § 2000e(k). "The [Pregnancy Discrimination Act] created no new rights or remedies, but clarified the scope of Title VII by recognizing certain inherently gender-specific characteristics that may not form the basis for disparate treatment of employees." *Hall v. Nalco Co.*, 534 F.3d 644, 647 (7th Cir. 2008) (citing *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 678-79 (1983)). "The [Pregnancy Discrimination Act] 'made clear that, for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex.'" *Id.* (quoting *Newport News*, 462 U.S. at 684); *see also Griffin v. Sisters of Saint Francis, Inc.*, 489 F.3d 838, 843 (7th Cir. 2007) (stating that "pregnancy is a proxy for gender, and, therefore, discrimination against pregnancy is discrimination against women").

Quinlan argues that she has sufficient evidence to show sex discrimination using the direct method of proof.[3] Quinlan presents a series of statements and conduct that she believes create a mosaic of circumstantial evidence of discrimination. Many of these statements are detailed in the affidavit Quinlan submitted in response to Elysian's motion for summary judgment. *See* R. 36-1 (Quinlan Decl.). Elysian argues

---

[3]In her summary judgment brief, Quinlan does not attempt to prove discrimination under the indirect direct method.

that the Court should disregard much of Quinlan's affidavit because it contradicts her previous deposition testimony. R. 39 (Def.'s Reply) at 7-10. Thus, the Court's first task is to determine which of Quinlan's statements can be considered in deciding this summary judgment motion.

Elysian relies on the general 'no do-over' litigation principle: a party cannot defeat summary judgment by having a witness contradict (via an affidavit submitted during briefing) her own prior deposition testimony. Def.'s Reply at 7 (citing *Adelman-Tremblay v. Jewel Cos.*, 859 F.2d 517, 521 (7th Cir. 1988)). After all, deposition testimony is given under-oath. But as the Seventh Circuit has recognized, "[a] number of scenarios might explain a change [in testimony]: a confusing deposition question, circumstances indicating a lapse of memory, relevant new information discovered after the original testimony, or ambiguous or incomplete earlier testimony." *Patton v. MFS/Sun Life Fin. Distribs., Inc.*, 480 F.3d 478, 488 (7th Cir. 2007) (internal citations omitted). Thus, the Court "must examine the particular circumstances of a change in testimony to see whether it is plainly incredible or merely creates a credibility issue for the jury." *Id.* Here, Quinlan does not offer any reason for her failure to testify during her deposition about the comments listed in her affidavit. Nor does she explain why some of the information in her affidavit conflicts with her deposition testimony. Although it would have been helpful for Quinlan to explain why she did not disclose the various comments in her affidavit during discovery, the Court will examine the record—particularly Quinlan's deposition transcript—to determine whether Quinlan

should be precluded from relying on the testimony offered in her subsequent affidavit. *See id.* at 488 n.6.

Most importantly (for reasons explained below), the Court concludes that the affidavit's additional detail concerning alleged remarks made by Mary Beth Malone (the director of marketing) do *not* impermissibly go beyond Quinlan's deposition testimony. The affidavit avers that, right before Quinlan went on maternity leave in October 2010, Malone told Quinlan that if Quinlan decided not to come back to work after having her baby, she could "always get back into PR later in life," and then proceeded to compare Quinlan to two other employees: "Like look at Lara and Jill, they are older, have kids and are doing PR in a way that works for them. It's just something to seriously think about because the workload is not going to get less and it will be very difficult to do this job and be a good mom." Quinlan Decl. ¶ 15.[4]

When previously questioned about conversations with Malone at her deposition, Quinlan testified that "throughout the pregnancy [she] was consistently berated with questions from Mary Beth [Malone] . . . about when [she] was coming back to work, what [she] was going to do for child care, . . . it was even insinuated maybe [she'd] be better off staying home." R. 50-1 (Quinlan Dep.) at 128. Quinlan testified that "closer to the time [she] was leaving . . . [Malone] . . . said . . . you only get to be a mom once and, . . . I would think about . . . what you are going to do . . . [I]t's going to be hard to manage this workload and be a mom." Quinlan Dep. at 133-34. During one

_____

[4]According to Quinlan, Lara Shipp and Jill Katz are two women who worked in public relations who became pregnant before Quinlan had this conversation with Malone. Quinlan Decl. ¶ 16.

conversation—it's not clear whether it was during the same pre-leave conversation—Malone told Quinlan, "you don't have to come back here . . . [B]ut keep your foot in PR . . . [I]t's always good to keep it in there. There's lots of opportunities out there." Quinlan Dep. at 139. Quinlan testified that Malone's comments were made to her during their weekly meetings over the course of a couple of months. Quinlan Dep. at 143. Quinlan also testified that the comments about her coming back to work were all made within the three month period leading up to the birth of her child, or July through October 2010. Quinlan Dep. at 136. Quinlan was then asked:

> Q. Any other comments besides what we've talked about that you feel were harassing?
>
> A. Not that I can recall at this time.
>
> Q. Is there anything that would help you remember?
>
> A. No.

Quinlan Dep. at 143.

On the second day of Quinlan's deposition, Elysian's counsel revisited the topic of comments made by Malone. *See* Quinlan Dep. at 290-97. Quinlan again testified that, during weekly meetings, Malone would question her about when she planned to come back to work after maternity leave. Quinlan Dep. at 290-91. Quinlan was asked:

> Q. Anything else that you remember about those conversation—that comment or that question to you?
>
> A. I think I fully explained it yesterday. I don't have anything additional to add, no.

Quinlan Dep. at 292-93.

Defense counsel also asked about Quinlan's memory of workload-related comments made by Malone. Quinlan testified that she had three conversations with Malone regarding workload and maternity leave "that included comments about child care, coming back, and how long [her] leave was going to be." Quinlan Dep. at 295-96.

> Q.    Any other comments that we haven't discussed that you thought were harassing because of your gender or your pregnancy?
>
> A.    Any other particular comments? No, not that we have not discussed.

Quinlan Dep. at 297.

It is true that the affidavit's discussion of Malone does not match word-for-word with Quinlan's deposition testimony, and it is also true that *omissions* in deposition testimony can form the basis to preclude statements made in later-filed affidavits. For example, in *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 688 (7th Cir. 2008), the Seventh Circuit concluded that it was reasonable to disregard a gender-based statement presented for the first time in the plaintiff's affidavit, and was not mentioned by the plaintiff at her deposition. The plaintiff's affidavit in *Gates* did not necessarily conflict with her testimony from her previous deposition. *Id.* But *Gates* concluded that "the *omission* of such a significant statement during her deposition in a sex discrimination case speaks volumes." *Id.* (emphasis in original). *Gates* continued,

> [The plaintiff's] explanation for not having mentioned this potentially vital remark during her deposition is that Caterpillar's lawyer "moved on to other areas" without asking her "specifically" what she told [her supervisor] so she was therefore "never asked to relate in detail that conversation." Ironically, however, in her own brief just sentences before, Gates enumerates for this Court several tidbits from that conversation that she said she volunteered ("[w]ithout being asked") during her deposition. In light of this, to allow such evidence now would have the same effect as would allowing directly conflicting testimony; that

8

is, "the very purpose of the summary judgment motion—to weed out unfounded claims, specious denials, and sham defenses—would be severely undercut."

*Id.* (quoting *Babrocky v. Jewel Food Co.*, 773 F.2d 857 (7th Cir.1985)).

But "where the deposition testimony is ambiguous or incomplete . . . the witness may legitimately clarify or expand upon that testimony by way of an affidavit." *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1007 (7th Cir. 1999). In reviewing a summary judgment motion, the Court must take seriously the need "to balance the competing interests of determining whether a subsequent statement so clearly contradicts an earlier one so as to disallow it as a matter of law or whether it creates an issue of credibility more properly resolved by the trier of fact." *Gates*, 513 F.3d at 688 n.5 (citing *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)). "[A]s a general rule, a party may not create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony in the absence of newly-discovered evidence or the unmistakable need to clarify prior ambiguous statements . . . It is less obvious when . . . the 'new' statement adds to, without directly contradicting, prior testimony although the prior testimony is perfectly clear." *Id.*; *see also Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292-93 (7th Cir. 1996) (district court did not abuse its discretion in disallowing very specific description in affidavit after plaintiff's previous deposition offered merely general commentary on its physical nature when that specificity was necessary to establish causal link). Indeed, it is well-settled that the party opposing summary judgment "may attempt to clarify or augment (but not

contradict) prior deposition testimony through affidavits." *Simmons v. Chicago Bd. of Ed.*, 289 F.3d 488, 492 (7th Cir. 2002).

With these principles in mind, the Court concludes that, under the circumstances of this case, paragraph 15 of Quinlan's affidavit does not impermissibly add to her deposition testimony. Quinlan's description of Malone's comment about Lara and Jill (two other public-relations executives who left full-time work after having children) does not contradict Quinlan's prior deposition testimony, but instead modestly clarifies the conversations she testified about at her deposition. The same goes for the affidavit's allegation that "the workload is not going to get less and it will be very difficult to do this job and be a good mom," Quinlan Decl. ¶ 15, when compared to the similar deposition testimony, "[I]t's going to be hard to manage this workload and be a mom," Quinlan Dep. at 133-34. All in all, even though the affidavit is not word-for-word with Quinlan's deposition, paragraph 15 of Quinlan's affidavit does not fill in so many gaps that Quinlan has, in effect, contradicted the deposition. *Gates* does not require an identical recitation of the comment allegedly made to the plaintiff, especially where, as here, the plaintiff did testify generally about the contents of the conversation, and in a way that is consistent with the affidavit. For these reasons, paragraph 15 will be considered in the light most favorable to Quinlan.

But other statements do impermissibly contradict the deposition testimony. Specifically, turning to these other affidavit statements that Elysian seeks to exclude, *see* Def.'s Reply at 9-10, the Court will disregard the following statements as conflicting with Quinlan's deposition testimony:

- Paragraph 4: "I worked with Joseph Aguilera on a daily basis." At her deposition, Quinlan testified that she "had little interaction with [Aguilera] from a day-to-day standpoint." Quinlan Dep. at 50-51, 54-55.

- Paragraph 10: Quinlan describes a conversation that she had with Robinson in the summer of 2010 at Elysian Hotel, after she informed human resources that she was taking maternity leave. Quinlan states that Robinson told her about the childcare difficulties he and his wife faced as they were starting their own family. At her deposition, Quinlan testified that she had *one* conversation with Robinson about childcare, and that conversation occurred during a taxi cab ride back from an outside hotel event. Quinlan Dep. at 143, 293-94.

- Paragraph 18: "[T]here is a punch clock on premises that I had to punch in and out for security purposes that shows the hours I was in the building." At her deposition, Quinlan testified that she did not have to punch a clock to keep track of her hours. Quinlan Dep. at 103. Quinlan testified that she did not keep track of her time because she held a salaried position. Quinlan Dep. at 59 ("There's no clock in, clock out or anything like that.").

- Paragraphs 24 (first sentence) and 25: Quinlan states, "[m]arketing responsibilities were merely added after I announced my pregnancy . . . Public relations were my sole responsibility, [and] the July 2010 Photo Shoot was a Marketing shoot and should not have been my responsibility." But, at her deposition, Quinlan testified that marketing photo shoots became part of her job responsibilities after Gianna Tetrick (director of marketing) was fired by Elysian in December 2009. Quinlan Dep. at 41-43, 79-80.

Now the Court must decide whether the remaining statements constitute "'a convincing mosaic' of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Silverman v. Bd. of Ed. of City of Chicago*, 637 F.3d 729, 734 (7th Cir. 2011). Indeed, Quinlan relies primarily on her affidavit to defeat Elysian's motion for summary judgment. *See* R. 34, Pls.'s Resp. to Def.'s Stmt. of Facts; R. 35, Pl.'s Stmt. of Facts (PSOF); R. 37, Pl.s' Br.

Quinlan argues that comments made by Robinson, Aguilera, and Malone demonstrate that she was fired due to her "sex and pregnancy." Pl.'s Br. at 15.

Although many of the alleged discriminatory comments were made during Quinlan's pregnancy, Quinlan was not fired until after she gave birth and returned to work *after* taking maternity leave. So Quinlan's claim really seems to fall under the umbrella of sex/gender discrimination based on Quinlan's status as a new mother.[5] In other words, Quinlan seems to be making the argument that she was fired due to her supervisors' illegal gender-stereotyping and assumption that women who are new mothers are not able to remain committed to their work and are better off staying at home with a young child. *See, e.g., Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 45 (1st Cir. 2009) ("[A]n employer is not free to assume that a woman, because she is a woman, will necessarily be a poor worker because of family responsibilities."); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 120 (2d Cir. 2004) (finding discrimination where

---

[5]To be sure, the Seventh Circuit has described the Pregnancy Discrimination Act as "a statute that brought discrimination based on pregnancy within a woman's protections against sex discrimination." *Griffin*, 489 F.3d at 842 (emphasis omitted) (quotation and citations omitted). However, it's a separate issue whether Quinlan can bring a *pregnancy* discrimination claim based on the employer's motive *after* giving birth and returning from maternity leave. In *Piantanida v. Wyman Ctr., Inc.*, the Eighth Circuit addressed "the narrow question of whether being discriminated against because of one's status as a new parent is 'because of or on the basis of pregnancy, childbirth, or related medical conditions,' . . . and therefore violative of the PDA." 116 F.3d 340, 342 (8th Cir. 1997). Answering in the negative, the court held that "an individual's choice to care for a child is not a 'medical condition' related to childbirth or pregnancy. Rather, it is a social role chosen by all new parents who make the decision to raise a child. While the class of new parents of course includes women who give birth to children, it also includes women who become mothers through adoption rather than childbirth and men who become fathers through either adoption or biology. An employer's discrimination against an employee who has accepted this parental role—reprehensible as this discrimination might be—is therefore not based on the gender-specific biological functions of pregnancy and child-bearing, but rather is based on a gender-neutral status potentially possessible by all employees, including men and women who will never be pregnant." *Id.* (citations omitted); *see also* Def.'s Br. at 8 n.2 (collecting cases). In any event, as discussed in the text, it *is* sex discrimination to fire a woman based on an employer's view that a new *mother* cannot, simply because she is a new mother, dedicate enough time or energy to the job.

a woman professor was told that she cannot "be a good mother and have a job that requires long hours," and that "a mother who received tenure would not show the same level of commitment she had shown because she had little ones at home").

In any event, the Court must determine whether a reasonable jury could conclude that Quinlan's supervisors' statements reflected unlawful sex discrimination. To survive Elysian's motion for summary judgment, the "bits and pieces" Quinlan presents in support of her mosaic of circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003); *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) ("[T]here must be a real link between the bigotry and an adverse employment action."); *see also Fleishman v. Continental Casualty Company*, 698 F.3d 598, 603 (7th Cir. 2012) ("[F]undamentally the plaintiff must connect the circumstantial evidence to the employment action such that a reasonable juror could infer the employer acted for discriminatory reasons.").

Here, Quinlan claims that Aguilera, one of the decision-makers, told her in March 2010 (remember, Quinlan was fired in February 2011) that he knew she was pregnant but that the workload was not going to lighten up and Quinlan would be expected to spend more time at Elysian and at outside events. Quinlan Decl. ¶ 13. Quinlan also points to an incident in January 2011 when, after Quinlan had returned from maternity leave, Aguilera entered Quinlan's office and shouted at her about emailing the Elysian CEO despite being instructed not to do so. Quinlan Decl. ¶ 46. Quinlan believed that Aguilera's outburst was motivated by gender discrimination, and

reported to Elysian's human resources representative that Aguilera "had a problem with women." Quinlan Decl. ¶¶ 47. Finally, Quinlan points out that Aguilera required her to work the photo shoot in July 2010, denied her request for a flexible work schedule, and refused to pay Quinlan her bonus for the 2010 work year. Quinlan Decl. ¶¶ 37, 40, 43.

Regarding another decision-maker in this case, Kevin Robinson, Quinlan contends that Robinson talked to Quinlan about the personal hardships he faced when his wife gave birth to their first child. Quinlan Decl. ¶ 11. Specifically, during a cab ride home from a July 2010 event, Robinson told Quinlan that it was "not a big deal" if she did not want to return to work at Elysian after her baby was born, and staying at home was a sacrifice that Quinlan should make for her family, but that statement was made in the context of Robinson's own struggles in arranging childcare. Quinlan Decl. ¶ 11. During the conversation, Robinson asked Quinlan several times about whether she was sure that she wanted to come back to work after having a child. *Id.*[6]

In determining whether Quinlan has met her burden of proof under the direct method, the Court must consider Aguilera and Robinson's remarks, "despite being attenuated from the adverse employment action, in conjunction with all of the other

---

[6]Quinlan also argues that her job responsibilities increased after she disclosed her pregnancy to her supervisors at Elysian. Pl.'s Br. at 10. For instance, Quinlan contends that she was required to do an outdoor summer photo shoot in July 2010, despite alerting Aguilera and Malone to health concerns related to her pregnancy. This evidence is not particularly probative, however, in light of Quinlan's deposition testimony that she took on marketing responsibilities in late 2009 after Tetrick was fired, and *before* Quinlan announced her pregnancy. And, as discussed above, the Court disregards Quinlan's statements that marketing duties were added after she announced her pregnancy because they contradict her deposition testimony.

evidence of discrimination to determine whether [Quinlan's] claim can survive summary judgment." *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1115 (7th Cir. 2009). Here, Quinlan alleges that Aguilera and Robinson each had one conversation with her in March 2010 and July 2010, respectively, about the difficulties she would likely face as a working mother (the other statements by Aguilera do not add to the mix because they are not reflective of discrimination). There are reasons to doubt whether those comments are probative of discrimination: first, both were made several months in advance of the February 2011 firing, and usually a time gap of around 11 months and 7 months between remarks and the employment decision substantially reduces the probative force of the remarks. But perhaps a reasonable jury would conclude that for a claim of Quinlan's type—that the employer discriminated based on a view that new mothers cannot (or are less able to) do the job—it is not so unusual for there to be a substantial time gap between a discriminatory remark and the firing, because the basis for the discrimination (taking care of the newborn while doing the job) does not actually occur until after the pregnancy, as well as, sometimes, after a maternity leave. (Of course, a jury could conclude otherwise, namely, that the time gap shows that there is no discrimination.) Aside from the time gap, the other reason to doubt the relevancy of Robinson's statements is that he made them in the context of describing Robinson's own personal struggles in arranging childcare (plus the conversation took place during a cab ride, adding to the personal rather than business context of the statements). Again, however, a reasonable jury could conclude otherwise, especially if Robinson made the comments unprompted by any advice-seeking from Quinlan and if he

emphasized the difficulty of working and raising children repeatedly in the same conversation.

In any event, whether or not Aguilera's and Robinson's statements are enough to raise a genuine issue, Malone's comments standing alone are sufficient circumstantial evidence that discrimination may have influenced Elysian's decision to fire Quinlan. For instance, Quinlan testified that Malone repeatedly asked her how long she would be out and, during one conversation, recommended that Quinlan consider returning to the public relations field "later in life" because it would be difficult to manage work and being a "good mom." Quinlan Decl. ¶ 15. Quinlan testified that these conversations with Malone occurred during weekly business meetings, and it was Malone who would bring up the subject of Quinlan's pregnancy "on multiple occasions," inquiring how Quinlan was "going to manage a baby and this workload" because "this workload's not going to change." Quinlan Dep. at 131. Malone reminded Quinlan that she "only get[s] to be a mom once" and Quinlan should think about whether she can manage work and motherhood. *Id.* at 133-34.

Malone's statements were made closer in time (including in October 2010) to the February 2011 firing than the statements of Aguilera and Robinson, and there is evidence that Malone was involved with the decision to fire Quinlan in February 2011. Between 2002 (when the idea of the Hotel was just forming) and 2012, Malone was a development partner for Elysian and held several different developmental and operating roles. R. 26-1, Def.'s Exh. G (Malone Decl.). As a member of the development team, Malone was considered a partner with Elyisan's primary capital investor,

Arcapita. DSOF ¶ 8. To operate the hotel, the development team established the planning committee, which included Aguilera and Robinson. DSOF ¶ 9. In early 2011, the planning committee was responsible for identifying which managerial positions could be eliminated from Elysian's payroll. DSOF ¶ 65. Aguilera and Robinson determined that Elysian could operate without a public relations director, and recommended that Quinlan be fired. DSOF ¶¶ 68-70. Malone and the other development partners ultimately agreed with the planning committee's recommendation, and approved the decision to fire Quinlan. DSOF ¶¶ 74-75.

Elysian argues that Malone's comments were not discriminatory, rather, they were made during "girl talk"[7] conversations where Quinlan and Malone would chat about life as friends. Def.'s Reply at 11. Indeed, it is quite possible that a jury will believe Malone's testimony and decide that Malone's comments were nothing more than conversations between co-workers about the difficulties of working and raising a newborn at the same time. That topic is no doubt frequently discussed in many, many workplaces. But, at this stage, the Court must view the evidence in Quinlan's favor,[8] and when the content of the remarks are combined with the settings in which

_____

[7]Those are Malone's own words, drawn from her deposition; that is not the label used by Quinlan, this Court, or defense counsel. The Court notes that the defense briefs were exceptionally well written.

[8]That standard of review is significant to this decision—a jury, not bound by the need to view evidence in Quinlan's favor, and instead bound by a jury instruction that *Quinlan* bears the burden of proof—might very well reject Quinlan's versions of the conversations and decide there was no discrimination here (indeed, even if the jury accepted Quinlan's versions of the conversations, the jury could still conclude that there was no discrimination). It is also worth emphasizing that Elysian submitted strong evidence showing Elysian's financial distress and demonstrating the hotel's need to eliminate job positions to stay afloat. But because there is

they were made, and the repetitiveness with which they were made, and that it was allegedly Malone who repeatedly brought up the subject, the remarks are evidence of discrimination.

Finally, there is a last piece of evidence that Quinlan offers for the "mosaic," and it relates to pretext. It is worth addressing this so that the parties know whether this last piece will be admissible at trial. Quinlan contends that Elysian's reasons for firing her are pretextual. According to Elysian, the hotel was forced to eliminate seven salaried positions, including Quinlan's position as public relations director, in order to avoid bankruptcy. DSOF ¶¶ 71-75. To show pretext, Quinlan must provide evidence suggesting that the proffered reason for firing her was "a lie—not just an error, oddity, or oversight." *Van Antwerp v. City of Peoria*, 627 F.3d 295, 298 (7th Cir. 2010); *see also Filar v. Bd. of Educ. of the City of Chicago*, 526 F.3d 1054, 1063 (7th Cir. 2008); ("Showing pretext requires proof that the defendant's explanation is unworthy of credence.").

Quinlan argues that Elysian's reason for firing her is dishonest because, later that week, Elysian added two new employees to its payroll. Pl.'s Br. at 14. Quinlan argues that adding new employees to the "department payroll" demonstrates that Elysian was not actually concerned with cutting costs at that time. *Id.* at 12-14. But as Elysian points out (and Quinlan fails to dispute), these new employees were "revenue producers" in that they produced more revenue for the hotel than the sum of

_____

*some* evidence that would permit a jury to infer that discrimination motivated Elysian's decision, the Court must deny summary judgment on Count 1.

their wages and benefits. Def.'s Reply at 15. Quinlan's assertion that Elysian "padd[ed] the payroll by hiring public relations services" after firing Quinlan likewise has no basis in fact. *See* Pl.'s Br. at 14. Quinlan points to invoices from Karrie Leung, a public relations firm to which Elysian outsourced some of its work, that range from $4,000 to $5,000 per month. R. 49-2, Pl.'s Exh. 3; Def.'s Br. at 10. This is a far cry from keeping a full-time public relations director with a salary of over $80,000 per year on staff. In short, a reasonable jury cannot rely on this evidence as proof of discrimination, so Quinlan will not be permitted to introduce that evidence at trial.

## IV. Family Medical and Leave Act

"To prevail on an FMLA interference claim, an employee must show that: (1) she was eligible for FMLA protection; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her intent to take FMLA leave; and (5) her employer denied her the right to FMLA benefits." *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 825 (7th Cir. 2012).

Aside from reciting the elements required to establish an FLMA interference claim, Quinlan's response brief does not address this claim. *See* Pl.'s Br. at 6-7. Quinlan's Local Rule 56.1 statement (which is based almost entirely on her affidavit) asserts that, when Quinlan was on maternity leave, Malone contacted her 25 to 30 times for work-related matters and assignments. PSOF ¶ 32. But Quinlan's failure to develop her claim with argument and citations to the record constitutes a waiver of the claim. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) (holding that

claims not addressed in a brief opposing summary judgment are waived). Elysian's motion for summary judgment on the FMLA interference claim is granted.

## V. Harassment

To establish a prima facie case of sexual harassment, a plaintiff must show that "(1) she was subjected to unwelcome harassment; (2) the harassment was based on her sex; (3) the harassment was sufficiently severe or pervasive so as to alter the condition of her employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007). For the third element, "[c]ourts look to several factors to determine whether alleged harassment was objectively offensive, including the frequency of the conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the alleged victim's work performance." *Id.*

Quinlan's response brief does not adequately address her harassment claim. Quinlan asserts that "[e]vidence that an employee complained to her supervisors and to Human Resources, but who is rebuffed and even insulted constitutes admissible, circumstantial evidence of harassment." Pl.'s Br. at 3. But Quinlan fails to demonstrate how the January 2011 incident involving Aguilera was "sufficiently severe or pervasive to rise to the level of actionable harassing conduct." *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 732 (7th Cir. 2009). Elysian's motion for summary judgment with respect to Quinlan's harassment claim is also granted.

## VI. Conclusion

Elsyian's motion for summary judgment [24] is denied with respect to Quinlan's Title VII claim for sex discrimination. The Court grants Elysian's motion for summary judgment on the FMLA interference and harassment claims. At the January 28, 2013 status hearing, the parties must be prepared to discuss whether they wish to hold a settlement conference or set a trial schedule. If the parties conclude before the status hearing that they wish to hold a settlement conference, they should call the courtroom deputy to arrange one with the Court or to ask for a referral to the magistrate judge.

ENTERED:

*Edmond E. Chang*
_____
Honorable Edmond E. Chang
United States District Judge

DATE: January 4, 2013